In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00155-CR
_____

**JOHNNY RAY COLEMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 19-32563**

**OPINION**

The principal issue in this appeal is whether the trial court erred in failing to grant Johnny Ray Coleman's motion to quash an indictment, an indictment alleging that between April 21, 2016 and the day before his indictment Coleman committed a Class A misdemeanor in violation of the Texas Human Resources Code in "one scheme and continuing course of conduct" when he knowingly "use[d], transfer[red], and rede[emed] food stamp benefits, namely Electronic Benefit Transfer

1

Cards[,] in a manner not authorized by law[.]"[1] After the trial court denied Coleman's motion to quash, the case was tried. When the trial ended, the jury found Coleman guilty of the "Illegal Possession/Transfer of EBT Benefits, as charged in the indictment." After the jury considered the sentencing range based on the trial court's instruction in the charge and Coleman's pleas of "true" to the enhancement counts in the indictment, the jury gave Coleman a twenty-seven-year sentence.

After the trial court pronounced Coleman's sentence, Coleman appealed. On appeal, Coleman argues that there are three reasons he is entitled to receive a new trial. First, he contends the indictment failed to provide him with adequate notice of the "actions he allegedly committed to allow him to prepare a defense," and he claims the lack of notice caused him harm. Second, Coleman argues error exists in the charge used to submit the offense to the jury, which for sake of simplicity we will refer to as SNAP card fraud. According to Coleman, the charge enlarged on the offense by allowing the jury to consider whether he *trafficked* in SNAP

---

[1]*See* Tex. Hum. Res. Code Ann. § 33.011 (Prohibiting the knowing use, alteration, transfer, or possession of a supplemental nutrition assistance program electronic benefit card when "not authorized by law.").

benefits when the theory of trafficking was not one of the theories for committing the offense that is raised by the language used in his indictment. Third, Coleman contends the trial court should have even without his request included an accomplice witness instruction in the charge.

For the reasons explained below, we will affirm.

Background

*The SNAP Program*

The food stamp program began with the enactment of the Food Stamp Act of 1964.[2] The program is designed to "alleviate . . . hunger and malnutrition" by allowing those in low-income households "to purchase a nutritionally adequate diet through normal channels of trade."[3] Under the Act, Congress gave the Secretary of the U.S. Department of Agriculture the authority to formulate and administer the program, but it gave the agencies of each state that chose to participate in the program

---

[2]*See* Food Stamp Act of August 31, 1964, Pub. L. 88-525, 78 Stat. 703.
[3]7 U.S.C.S. § 2011 (LexisNexis, Lexis Advance through Public Law 118-3, approved April 10, 2023).

the "responsibility for certifying applicant households and issuing EBT cards" to the individuals who qualified to buy food.[4]

The State of Texas is among the states that elected to participate in the federal food stamp program. The Texas Health and Human Services Commission is the state agency responsible for operating the food stamp program in this state.[5] In 2008, Congress renamed the Food Stamp Act, and currently benefits delivered to participants in the program are known as SNAP benefits rather than food stamps.[6] As the agency in charge of administering the program in Texas, the Texas Health and Human Services Commission is responsible for ensuring the program is administered in a manner that complies "with federal regulations[.]"[7]

---

[4] 7 U.S.C.S. § 2013(a) (LexisNexis, Lexis Advance through Public Law 118-3, approved April 10, 2023), § 2020(a)(1) (LexisNexis, Lexis Advance through Public Law 118-3, approved April 10, 2023).

[5] *See* Tex. Hum. Res. Code Ann. § 11.001(2) (defining *Commission* as "Health and Human Services Commission"); *id.* § 33.0006 ("The commission operates the supplemental nutrition assistance program.").

[6] *See* Agricultural Security Improvement Act of May 22, 2008, Pub. L. 110-234, Title IV, § 4001, 122 Stat. 923.

[7] Tex. Hum. Res. Code Ann. § 33.002(d) (West and West Supp. 2022) (Even though the legislature amended the Human Resource Code section 33.002 after Coleman was indicted, the changes it made didn't include changing section 33.002(d), the section that addresses an offense

Under the federal legislation governing the program, Congress made it a crime to knowingly use, transfer, acquire, alter, or possess SNAP benefits "in any manner contrary to the" SNAP program.[8] And when it created the program, Congress delegated broad regulatory authority to the Secretary of the Department of Agriculture, authorizing the Department of Agriculture to issue regulations governing the delivery of SNAP benefits and to enter into cooperative arrangements with governmental authorities in states that chose to participate in the SNAP program so that a participating state through its agency in its state could deliver and administer the SNAP program in its state in accord with federal regulations governing the program.[9] What's more, even though the SNAP program is a creature of Congress, the costs of running the program are shared between a participating state and the federal government as to the cost of the program in that state.[10]

---

committed based on one scheme and continuing course of conduct. For convenience, we have cited the current version of the statute.).

[8] 7 U.S.C.S. § 2024 (LexisNexis, Lexis Advance through Public Law 118-3, approved April 10, 2023).

[9] *Id.*

[10] 7 U.S.C.S. § 2024(b) (Unauthorized use) (LexisNexis, Lexis Advance through Public Law 118-3, approved April 10, 2023).

Therefore, states that elect to participate in the program have a financial interest in minimizing SNAP card fraud.

In an effort to minimize and prevent fraud, the Texas legislature made it a crime to knowingly use, alter, transfer, possess or redeem a "supplemental nutrition assistance program electronic benefit transfer card in any manner not authorized by law[,]" the offense we are calling SNAP card fraud.[11] While the legislature passed a SNAP card fraud statute and made SNAP card fraud a state crime, the Texas legislature chose not to define the term *not authorized by law* in section 33.011 or in the Human Resources Code.[12]

Still, since SNAP benefits are a federal program, federal law provides rules and regulations governing the manner the program is administered in the states. These regulations include how the benefits available to participants in the program may be used. As relevant here, the Department of Agriculture's regulations governing the use of SNAP benefits:

- Limit the use of SNAP benefits to certified eligible households, that is households that are qualified as eligible through the Texas Health and Human Resources Commission

---

[11]Tex. Hum. Res. Code Ann. § 33.011(a), (b).
[12]*Id*. § 33.011; *see id*. §§ 1.001-261.151

6

under regulations prescribed by the Department of Agriculture;[13]

- Restrict an eligible household's use of SNAP benefits to the purchase of "eligible food for the household[;]"[14]

- Make the unauthorized issuance, redemption, use, transfer, acquisition, alteration, or possession of benefits, EBT cards, or other program access devices subject to prosecution under "section 15(b) and (c) of the Food and Nutrition Act of 2008 or under any other applicable Federal, State or local law, regulation, or ordinance."[15]

- Define *trafficking* as the "buying, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others or acting alone[.]"[16]

---

[13] 7 C.F.R. 274.2 (Providing benefits to Participants) (Lexis Advance through the May 31, 2023 issue of the Federal Register); 7 CFR 271.7 (Benefit redemption by eligible households); 7 C.F.R. § 271.7 (Lexis Advance through the May 31, 2023 issue of the Federal Register).

[14] 7 C.F.R. § 274.7 (Benefit redemption by eligible households) (Lexis Advance through the May 31, 2023 issue of the Federal Register).

[15] 7 C.F.R. § 271.5 (Benefits as obligations of the United States, crimes and offenses, forfeiture and denial of property rights) (Lexis Advance through the May 31, 2023 issue of the Federal Register).

[16] 7 C.F.R. § 271.2 (Definitions) (Lexis Advance through the May 31, 2023 issue of the Federal Register).

*Coleman's Indictment and Trial*

Between April 2016 and July 2019, Coleman owned and operated Coleman's Deli Burger in Beaumont, Texas. In April 2018, unusual activity involving the use of Plashette Carrington's SNAP card at a Sam's Club store in Beaumont came to the attention of Steven Lightfoot, an investigator for the Texas Human Health and Services Commission (the Commission). Lightfoot, who works from the Commission's Houston office, called Kenneth Parks another of the Commission's investigators to assist him in the investigation because Parks lives near Beaumont. Ultimately, Parks became the Commission's lead agent in Coleman's case.

During the Commission's investigation, Parks spoke with employees at Sam's and examined receipts there. In the initial stage of the investigation, Parks determined that Coleman had used SNAP benefits cards at Sam's to buy food in quantities he thought were akin to those in restaurants for food like burger patties, fries, condiments, and buns. Following several months of investigative work, work that included undercover surveillance by a team of investigators led by Parks, Coleman was videotaped loading food into his vehicle at Sam's. Investigators

8

followed Coleman from Sam's, and he was videotaped taking the food from his vehicle into Coleman's Deli Burger.

With help from Sam's, investigators from the Commission obtained evidence—point-of-sale receipts tied to Coleman's membership card at Sam's, which show SNAP cards tied to Coleman's account were being used to pay for food at Sam's. Using the receipts from Sam's bearing Coleman's account number, which also contain the numbers from the SNAP cards that were used in the transactions to buy food, the investigators determined whose SNAP cards were used in these transactions. After investigators interviewed and obtained statements from many of the cardholders whose SNAP cards had been used in these transactions, investigators determined that for several months SNAP cards tied to Coleman's account at Sam's were used to buy large quantities of food Based on records maintained by the Commission, the Commission determined that Coleman was not an authorized user on the SNAP cards used in the transactions that were tied to his account at Sam's.

Later, the Commission's investigators obtained a search warrant, which authorized police to search Coleman's Deli Burger. In the search,

9

Parks obtained additional evidence tying Coleman to the records from Sam's point-of-sale registers, records investigators had already retrieved from Sam's. In searching Coleman's restaurant, police also found receipts from Sam's and three SNAP cards in Coleman's wallet. The Commission did not issue the SNAP cards in Coleman's wallet to him, and he was not an authorized user on the three cards.

From records the Commission's investigators gathered in the investigation, Parks prepared detailed summaries to illustrate Coleman's use of SNAP cards, focusing mainly on the SNAP cards tied to Coleman's account at Sam's. One of the summaries—which was marked and admitted into evidence at Coleman's trial as Exhibit 16—shows that between April 2016 and May 2018, Coleman bought over $55,000 in merchandise from Sam's using SNAP cards that didn't belong to him. The same exhibit shows more than sixty individuals' SNAP cards were used at Sam's on Coleman's account in these transactions.

Under the federal regulations that govern the SNAP program, only households certified as qualifying for benefits may receive SNAP benefits, and even then, an individual issued a SNAP card may use the

card only at a participating retail food store to buy eligible food.[17] Moreover, under federal law a person with a SNAP card cannot sell or use their benefits in a manner that would violate federal law, and they may not sell or use their benefits in a manner that would violate a regulation issued by the Department of Agriculture under the Food and Nutrition Program of 2008.[18]

To prove SNAP card fraud under Human Resources Code section 33.011, the State must prove the defendant *knowingly* engaged in the prohibited conduct.[19] Coleman's indictment alleged that he knowingly used, transferred, and redeemed food stamp benefits (EBT Cards) in a manner not authorized by law. During the trial, the State presented evidence showing that in October 2017 following Hurricane Harvey, Coleman applied for SNAP benefits under the Disaster SNAP program, and the application he filled out informed him that he could not use, transfer, or redeem the benefits by purchasing and then using the SNAP benefits that were on another's card. The application for Disaster SNAP Food Benefits, which Coleman signed, states:

---

[17] 7 C.F.R. 274.7(a).
[18] 7 U.S.C.S. § 2024.
[19] Tex. Hum. Res. Code Ann. § 33.011(b).

Everyone who gets SNAP benefits must follow these rules (1) Don't give false information or hide information to get SNAP, (2) don't give or sell your Lone Star Card to anyone not authorized to use it, (3) don't use SNAP benefits to buy unauthorized items such as alcohol or tobacco, and (4) don't use another person's SNAP benefits if you are not on their SNAP case.[20]

At trial, one of the Commission's investigators—Iris Baros—testified that when Coleman signed the Disaster-SNAP application, all those who apply for benefits are made aware that they can't buy, sell, or give away their cards. She also testified that the rules about trafficking against SNAP benefits apply equally to Disaster-SNAP and SNAP benefits.

Turning to the specifics of Coleman's indictment, the record shows that in July 2019, a Jefferson County grand jury indicted Johnny Ray Coleman for engaging in a scheme and continuing course of conduct that began on April 21, 2016, and continued until the presentment of the indictment for knowingly using, transferring, and redeeming food stamp benefits, namely Electronic Benefit Transfer Cards, in a manner not authorized by law.[21] On appeal, Coleman's complaints revolve around the

---

[20]In Texas, SNAP benefits are on an EBT card that the Commission named the Lone Star Card.

[21]*See* Tex. Hum. Res. Code Ann. § 33.011(a), (b).

indictment and the charge. To be clear, he doesn't argue that the evidence doesn't establish beyond reasonable doubt that he knowingly engaged in the conduct prohibited by the SNAP program. Instead, he argues the indictment didn't provide him with fair notice of what the State claimed his unauthorized conduct was before his trial, the charge enlarged on the conduct alleged in his indictment, and the trial court omitted the accomplice witness instruction in the charge.

Twenty-one months after Coleman was indicted, Coleman moved to quash the indictment. He filed his motion to quash on the day the trial court notified him that he was being called to trial. In his motion to quash, Coleman argued that because his indictment didn't detail what conduct was "not authorized by law," the indictment didn't provide him with sufficient "notice of the acts he is accused of committing," and therefore failed to "fairly inform [him] of the charge against which he must defend[.]"

On the morning of the first day of the trial and before selecting the jury, the trial court conducted a hearing on Coleman's motion to quash. Coleman's attorney argued that because the indictment didn't specifically state what the State claimed Coleman did that was "not

13

authorized by law," the indictment is "extraordinarily vague, ambiguous in nature, and does not give our client the opportunity to adequately defend or recognize what he's charged with." In response, the State argued the indictment appropriately tracked the language of the statute, and that under federal law, the use, transfer, or redemption of SNAP benefits is not authorized by law when it is done by *trafficking*, which the prosecutor explained is a defined term in the Code of Federal Regulations. Coleman's attorney was apparently aware the Code of Federal Regulations defines trafficking as it relates to the food stamp program. During the hearing, Coleman's attorney told the trial court that section (d) of the Human Resources Code "talks about trafficking in Food Stamps." Then, Coleman's attorney added that in the indictment, the State "could have easily put in what in effect this - - our client was allegedly doing that was wrong. That would have given us knowledge in order to adequately prepare a defense in this case." In denying the motion to quash, the trial court observed (without further comment) that the indictment tracked the language of the statute.

In the guilt-innocence phase of the trial, seventeen witnesses testified for the State. Ten of the State's witnesses testified they were

14

employed by the Commission and part of the team the Commission used to investigate Coleman's case. The ten witnesses who were part of the investigation conducted by the Commission described their roles in the investigation, which occurred in 2018. For instance, Ken Parks testified that among the tasks he completed included preparing summaries of the documents the Commission obtained in its investigation, summaries that list the dates, SNAP card numbers, names of SNAP cardholders, and dollar amounts charged to SNAP cards on dates the Commission attributed to Coleman's unauthorized use of the SNAP cards of others under the regulations that apply to the SNAP program.

Two of the witnesses called by the State—Steve Helms and Mark Odom—were not employed by the Commission. They testified that in 2018, they worked for Sam's Club or its parent corporation, Walmart. Helms explained that even though he had since retired from Sam's, he was Sam's asset-protection manager in 2018 when investigators from the Commission asked him to provide them with receipts and videotapes of Coleman's transactions with Sam's. The State used Helms to authenticate several exhibits that contain records relevant to Coleman's transactions at Sam's.

Odom, who testified he is still works for Walmart as an investigator, explained that he provided the Commission's investigators with two computerized reports, which summarize Walmart's business records. One of the reports lists the transactions tied to Johnny Coleman's membership card at Sam's. That report shows Coleman's use of his Sam's account between May 19 and August 10, 2018. This report contains columns listing information that includes: dates the transactions at Sam's occurred; the SNAP card numbers used to pay for the merchandise; the Sam's membership number and member's name (Johnny Coleman); information about type of payment used for the transaction (Debit Card, EBT Food Stamps, Walmart Credit Card, Cash); the credit or debit card account number if used; the amount charged to the credit or debit card if used; and the total amount the customer tendered at checkout in the transaction.

Of the remaining five witnesses called by the State, four testified they allowed Coleman to use their SNAP cards in return for cash. The remaining witness testified that she allowed Coleman to use her SNAP card even though she didn't get anything in return for Coleman's use of

her card. All five admitted they pleaded guilty to committing SNAP card fraud.[22]

On appeal, Coleman hasn't challenged the legal or factual sufficiency of the evidence supporting his conviction. Instead, he argues (1) the indictment provides inadequate notice, (2) the charge enlarged the offense with which he was charged, and (3) the trial court erred in failing to include an accomplice witness instruction in the charge.

Analysis

*Motion to Quash*

We turn first to the trial court's ruling on Coleman's motion to quash. The paragraph of the indictment charging Coleman with SNAP card fraud reads as follows:

> THE GRAND JURORS for the County of Jefferson, State aforesaid, duly organized as such at the July Term, A.D., 2019, of the 252nd District Court of Jefferson County, in said County and State, upon oath in said Court present that JOHNNY RAY COLEMAN, hereafter styled the Defendant, committed an offense hereafter styled the primary offense, pursuant to one scheme and continuing course of conduct beginning on or about the 21ST day of APRIL, TWO THOUSAND AND SIXTEEN, and continuing through on or about the 18TH day of MAY, TWO THOUSAND AND EIGHTEEN, and anterior to the presentment of this indictment, in the County of Jefferson and State of Texas, did

---

[22]Tex. Hum. Res. Code Ann. § 33.011.

then and there, [ ] knowingly use, transfer and redeem food stamp benefits, namely Electronic Benefit Transfer Cards in a manner not authorized by law, with a total value of over two hundred dollars[.][23]

In his brief, Coleman argues that even though the indictment tracks the statute, its allegations didn't adequately notify him before his trial of how he had violated the law because the indictment failed to set out what use, alteration, transfer, or redemption of the SNAP benefits had occurred that had been done in a "manner not authorized by law."

For example, Coleman notes the trial court attempted to remedy this problem when the parties finished presenting their evidence by defining the prohibited conduct in the charge as *trafficking*. The parts of the Code of Federal Regulations regulating the Food Stamp program include a definition of *trafficking* in food stamps.[24] According to Coleman, there are six distinct types of forbidden conduct falling within the definition of *trafficking* prohibited by the Food Stamp Act as that term is defined in the Code of Federal Regulations, which he says would

---

[23]Originally, the indictment alleged Coleman "intentionally and knowingly" committed the offense. Before submitting the case to the jury, however, the State abandoned the allegation alleging that Coleman "intentionally" violated the statute.

[24]7 C.F.R. § 271.2.

therefore also be prohibited conduct under Human Resources Code section 33.011 as conduct *not authorized by law*.[25] So looking to the indictment, Coleman concludes the language the State included in his indictment failed "to give him notice of what one of these six forbidden types of conduct" he was charged "with [] because [the indictment's language] doesn't specifically identify whether he violated one, two or all six types of 'forbidden conduct' listed in the federal regulation[.]"[26]

As Coleman sees it, because *trafficking* may occur in six ways— some of which do not include exchanging of SNAP benefits for cash or consideration other than eligible food, which Coleman contends are the theories of *trafficking* the trial court submitted in the charge—the indictment failed to provide him with enough information to allow him to prepare to defend himself against the indictment in the trial. Coleman concludes that since no definition exists for *not authorized by law* in section 33.011, the State was required to include more factual allegations in the indictment than it did to adequately inform him of what it claims he did wrong to violate the law so that he could have had an adequate

[25]Tex. Hum. Res. Code Ann. § 33.011(d).
[26]7 C.F.R. 271.2; Tex. Hum. Res. Code Ann. § 33.011.

19

opportunity to prepare his defense to the alleged misconduct before the trial.

Here, the indictment alleges a scheme that began in April 2016 and ended by at least July 23, 2019, the day before Coleman was indicted. Even though the indictment incorporates part of the language from sections 33.011(a), (b), and (d) of the Human Resources Code, Coleman's case involves criminal conduct that allegedly occurred over many years.

In cases involving indictments alleging conduct that spans a period of years, the Court of Criminal Appeals has explained that merely tracking the language of the statute is not enough to fulfill the statutory and constitutional requirements of specificity needed to give a defendant fair notice of the conduct with which he is charged.[27] That said, the Court of Criminal Appeals did not say the information necessary to fulfill the statutory and constitutional requirements of specificity must be alleged within the four corners of the indictment in all cases: instead, it said that

_____

[27]*See State v. Moff*, 154 S.W.3d 599, (2004) (affirming trial court's ruling granting motion to quash, reversing the appellate court's decision to reverse the trial court's ruling on the motion, and explaining that in a case in which an indictment alleged illegal purchases which had occurred over several years, tracking the language of the statute was insufficient "to fulfill the constitutional and statutory requirements of specificity").

20

a defendant could receive sufficient notice in cases where the indictment alleged a single offense involving criminal conduct that occurred over a period of years by "means other than the language in the charging instrument."[28]

In *Moff,* for example, the Court of Criminal Appeals noted that in an earlier case, *Kellar v. State*, it had explained that even though the allegations in the indictment alone were not sufficient, the State had satisfied the sufficient notice requirement by filing "an itemized list containing the dates, check numbers, and amounts of each transaction[.]"[29] Like *Moff,* Coleman was charged with separate criminal acts that when the jury considers them together allow the jury on finding the defendant guilty to convict the defendant of a single offense.[30] Because Coleman's indictment alleges acts that together constitute but a single offense, "details regarding the specific acts on which the State intends to rely [were] not required to be listed in the indictment, as long as they [were] provided by some other means."[31]

---

[28]*Id*. (cleaned up).

[29]*Id*. (citing *Kellar v. State*, 108 S.W.3d 311, 313 (Tex. Crim. App. 2003).

[30]*See* Tex. Hum. Res. Code Ann. § 33.011(d).

[31]*Moff*, 154 S.W.3d at 603.

21

When a case involves an indictment that alleges a single offense involving alleged criminal conduct that occurred over a period of months or years, we look to the entire record to determine two things: (1) did the defendant have notice by means other than the indictment, which provided him with sufficient notice of the conduct with which he was charged; and (2) if not, does the record nonetheless show that defendant was not actually harmed by any lack of notice.[32] For the following three reasons, we conclude the discovery and information the State produced to Coleman well before his trial provided him with adequate notice of the State's theory against which Coleman was required to defend as related to Coleman's use, transfer, and redemption of the SNAP cards transactions prohibited by law.

---

[32]*See Smith v. State*, 297 S.W.3d 260, 267 (Tex. Crim. App. 2009) (explaining a defendant may suffer no harm by any lack of notice in the indictment even though the indictment in a defendant's case isn't sufficiently sufficient when the allegations involve a course of conduct, a single offense, and the motion to quash if overruled, if the defendant received notice of the State's theory against which he would have to defend); *Kellar*, 108 S.W.3d at 313 ("due process may be satisfied by means other than the language in the charging instrument"); Tex. Code Crim. Proc. Ann. art. 21.19 ("An indictment shall not be held insufficient, nor shall the trial, judgment or other proceedings thereon be affected, by reason of any defect of form which does not prejudice the substantial rights of the defendant").

22

First, under the indictment, the State had to prove that when Coleman used, transferred, or redeemed the SNAP cards and then later used the benefits at Sam's, he knew what he was doing violated the laws that regulate the SNAP program. Because *not authorized by law* isn't defined in the Human Resources Code, the reference to *not authorized by law* must refer to violations of the Food and Nutrition Act of 2008 and the federal regulations promulgated under the Act.

It's important to our analysis that the Texas statute prohibiting SNAP card fraud required the State to prove that Coleman violated the SNAP card fraud statute *knowingly*.[33] Thus under Coleman's indictment, the State had to prove that Coleman knew that the manner he was *using, transferring,* or *redeeming* the SNAP cards or the SNAP benefits he obtained from others were uses, transfers or redemptions that were *not authorized by law*.[34]

---

[33] Tex. Hum. Res. Code Ann. § 33.011(a), (b).

[34] *See Mason v. State*, 663 S.W.3d 621, 631-32 (Tex. Crim. App. 2022) (explaining that section 64.012 of the Election Code requires the State to prove individuals know they are ineligible to vote to be convicted of illegal voting); *Delay v. State*, 465 S.W.3d 232, 250, 252 (Tex. Crim. App. 2014) (holding that a statutory requirement that a defendant *knowingly* commit an offense under the Election Code required the State to prove "the actor was actually aware of the existence of the particular circumstance surrounding that conduct that renders it unlawful").

Second, the discovery available to Coleman (and to his attorneys) provided Coleman with a roadmap of the State's case, which placed Coleman on notice of the State's theory that Coleman had engaged in a scheme of trafficking in SNAP benefits by *redeeming* the SNAP benefits of others for cash in return for the authorized users' agreements transferring their cards to him, which he then *used* to purchase food.

The record shows that long before trial, Coleman had access to the State's evidence, including the detailed summaries later introduced as exhibits—these summaries provided Coleman with a roadmap of the State's case. As a practical matter, the discovery to which Coleman had access months before his trial shows that Coleman was redeeming the SNAP cards of others at a discount for cash and then using the cards to buy food. The witness list and witness statements to which Coleman had access allowed Coleman to know how the State intended to show how he had acquired the various SNAP cards. The discovery available to Coleman included detailed point-of-sale receipts containing the dates of the alleged transactions that show when and where the transactions occurred. These transactions were laid out in summaries, all of which were available to Coleman. All this evidence gave Coleman fair notice of

24

the facts and the transactions the State intended to use to support the allegations in the indictment that Coleman *used, transferred*, and *redeemed* food stamps in violation of federal law.

There's also no doubt that this discovery was available to Coleman well before trial. In December 2019 Coleman filed a motion for continuance, complaining that he had been provided with a "voluminous amount of discovery" by the State with the "majority of the transactions" involving SNAP card transactions at Sam's. For instance, as of December 2019, the record shows that Coleman had access to the sixty exhibits, undercover surveillance videos, witness statements of over twenty witnesses, and DVD recordings from cameras inside Sam's. During the trial, Coleman never claimed he was surprised when the State introduced any of the evidence or when the State called any of the seventeen witnesses who testified in the trial.

Third, during the hearing on Coleman's motion to quash, Coleman never raised a claim of surprise when the prosecutor told the trial court that it was claiming Coleman was "trafficking" in benefits by violating regulations that apply to the SNAP program. Moreover, the evidence in the trial focused on Coleman's *redemption* of the SNAP card benefits of

25

others for cash, the *transfers* by authorized users of their SNAP cards to Coleman, and Coleman's later *use* of the SNAP benefits on the cards at grocery stores like Sam's. For instance in opening statement, the prosecutor told the jury that the State intended to prove that investigators from the Commission discovered that Coleman was using SNAP cards he obtained from more than 60 others to buy items at Sam's. Coleman did not raise a claim of surprise. Then, the prosecutor told the jury:

> Mr. Coleman knew that what he was doing was wrong, because . . . [the] evidence will also show that on October 7th, 2017, Mr. Coleman applied for and received disaster SNAP benefits, and he signed for that." I believe you will see that document. It basically says you can't buy and sell your Food Stamps because it's a crime.

Again, Coleman never claimed he was surprised. Over a year before the trial, the State filed a witness list of the witnesses it intended to call in the trial. None of the witnesses called by the State were not on the State's list.

At trial, four witnesses testified they sold Coleman their SNAP cards for 50 cents on the dollar for the value of benefits on their cards. Coleman never claimed surprise when the State introduced the application for D-SNAP benefits that he signed, an application in which

26

he acknowledged SNAP benefits cannot be sold, that a person cannot authorize another to use a SNAP card who has not been authorized to use it, and that he couldn't "use another person's SNAP benefits if [he wasn't] on their SNAP case." Since the State under the SNAP card fraud statute had to prove that Coleman *knowingly* violated the statute, his access to the witness statements, the receipts, the detailed summaries of the transactions, when coupled with the allegations in his indictment alleging conduct involving Coleman's *use*, *transfer*, and *redemption* of SNAP cards in a manner not authorized provided Coleman with sufficient other notice of what conduct the State intended to prove Coleman engaged in that violated the statute.

Finally, Coleman suggests that because the indictment isn't clear, it doesn't protect him from being prosecuted again for the same conduct involved in the scheme the State proved he engaged in between April and July 2019. We disagree. In considering whether Coleman is subject to being prosecuted again for the conduct covered by his indictment, a court has a right to consider the entire record and not just the indictment in

protecting him against double jeopardy should the State seek to prosecute him a second time for conduct on which he was tried.[35]

To sum it up, the evidence the State produced in discovery paints a clear roadmap sufficient to provide Coleman with notice by other means that the State intended to prove that Coleman *knowingly* engaged in an ongoing scheme of *redeeming* the SNAP card benefits of others for cash in return for their *transfer* to him of their cards, which he then *used* to buy food even though he was not authorized by the Commission to purchase food using the cards. Because the State gave Coleman adequate notice before the trial through means other than the indictment of the criminal conduct it intended to rely on to prove he violated the SNAP card fraud statute, Coleman's first issue is overruled.

*The Charge*

In Coleman's second issue, he argues the charge authorized the jury to convict him on theories not alleged in the indictment. According to Coleman, the charge authorized his conviction on the extra theories of selling, stealing, possessing, and altering SNAP cards when the theories

---

[35] *See Gollihar v. State*, 46 S.W.3d 243, 258 (Tex. Crim. App. 2001) (citing *United States v. Apodaca*, 843 F.2d 421, 430 n. 3 (10th Cir. 1988)).

alleged in the indictment were limited to *using*, *transferring*, and *redeeming* SNAP cards in a manner not authorized by law.

We review claims of charge error using a two-step process.[36] When evaluating charge error, we must first determine whether an error occurred.[37] If an error occurred, we then apply the appropriate harm analysis depending on whether the error was properly preserved by the defendant in the trial.[38] And determining whether harm resulted from an error in a charge is measured by a "some harm" standard if the defendant objected to the error in the court below, but by another standard known as "egregious harm" if the defendant didn't object.[39]

Coleman acknowledges he didn't preserve the error that he has complained about in his appeal, so we would reverse his conviction on his claim of charge error "only if the error was so egregious and created such harm that the defendant did not have a fair and impartial trial."[40] Egregious harm resulting from an error in a charge occurs only when the error "affects the very basis of the case, deprives the defendant of a

---

[36]*Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015).
[37]*Id.*
[38]*Id.*
[39]*Cyr v. State*, 665 S.W.3d 551, 557 (Tex. Crim. App. 2022).
[40]*Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016).

valuable right, or vitally affects a defensive theory."[41] In reviewing claims of charge error, we consider: "(1) the entirety of the jury charge itself, (2) the state of the evidence, (3) counsel's argument, and (4) any other relevant information revealed by the entire trial record."[42]

On appeal, Coleman complains that under the definition of trafficking in the charge, the jury was instructed to consider convicting him on theories of *selling*, *stealing*, *possessing*, and *altering* SNAP benefits even though those four theories are not among the theories alleged in the indictment. In part, we agree with Coleman that the charge the trial court submitted didn't confine the jury to the conduct covered by the allegations in his indictment. That said, on the record before us we nonetheless still conclude that Coleman's argument claiming he suffered harm due to the claimed error in the charge lacks merit.

The instructions section of the charge defining *trafficking* contains the language that according to Coleman, expanded upon the allegations in his indictment. That section of the charge reads:

> A use, transfer or redemption of food stamp benefits is not authorized by law when done pursuant to "trafficking".

[41]*Id.*
[42]*Id.*

30

"Trafficking" is the buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers, and personal identification numbers (PINS), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone.

Then, the application section of the charge states:

Now, if you find from the evidence beyond a reasonable doubt that Johnny Coleman, pursuant to one scheme and continuing course of conduct beginning on or about April 21, 2016 and continuing through on or about May 18, 2018, in Jefferson County, Texas, knowingly used, transferred or redeemed food stamp benefits, namely electronic Benefit Transfer Cards in a manner not authorized by law, with a total value of over two hundred dollars, then you will find the defendant guilty of the offense of Illegal Possession/Transfer of EBT Benefits.

We examine each of the words Coleman argues expanded on the allegations in turn starting with the fact that as defined by the charge the term *trafficking* included *selling* when the indictment didn't include that term. As commonly used, the verb *transfer* means "the conveyance of right, title, or interest in either real or personal property from one person to another by sale, gift, or other process."[43] Since *transferring* a right includes its *sale,* we conclude the indictment gave Coleman fair

---

[43] *Transfer,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2523 (2002).

31

notice that the State was charging him with engaging in a scheme or course of conduct that included *selling* SNAP benefits for cash or consideration other than eligible food. So in the context of SNAP card fraud as defined by section 33.011, we see no practical difference between the two verbs *transfer* and *sell*.

Coleman also complains the instruction on *trafficking* allowed the jury to consider whether he *altered* or *possessed* SNAP cards in a manner not authorized by law when that conduct isn't alleged in his indictment. But contrary to Coleman's claim, the word *alters* or *altered* isn't one of the terms the trial court used in defining *trafficking* in the charge.

Coleman complains the charge includes the word *possession* too when his indictment did not. We can't say the same thing, however, about the trial court's decision to include the word *possession* in the charge. While that true, the word *possession* isn't included in the definition of *trafficking*. Instead, *possession* appears in two places in the charge, first in the instructions section, where the trial court explains that Coleman is accused of "Illegal Possession or Transfer of EBT Benefits." It appears a second time in the applications section of the charge. There, the trial court instructs the jury that if it has found Coleman guilty of the

32

elements of SNAP card fraud, "then you will find the defendant guilty of the offense of Illegal Possession/Transfer of EBT (Electronic Benefit Transfer Card) benefits." In both of these places in the charge, the trial court uses the word as nothing more than a noun in the name of an offense. But as some say, "[w]hat's in a name? That which we call a rose[.]"[44] In defining an offense by a name different from the one used in the statute, the court didn't change the elements the State was required to prove Coleman guilty of committing SNAP card fraud.[45]

Instead, all the trial court did by labeling the crime with a name different from the one in the statute is to have created an incidental variance in the charge. When considering variances in a charge, the Court of Criminal Appeals has explained that, "[a]llegations giving rise to immaterial variances may be disregarded in the hypothetically correct [jury] charge, while allegations giving rise to material variances must be included."[46] In Coleman's case, the instructions and applications sections of the charge don't instruct the jury that *trafficking* includes *possession*

---

[44]*See* William Shakespeare, Romeo and Juliet, act 2, sc. 2.
[45]Tex. Hum. Res. Code Ann. § 33.011.
[46]*Hernandez v. State*, 556 S.W.3d 308, 313 (Tex. Crim. App. 2017) (cleaned up).

33

of SNAP cards or SNAP benefits. So we conclude that labeling what we have called SNAP card fraud as "Illegal Possession/Transfer of EBT Benefit Transfer Card Benefits" is nothing more than an immaterial variance in the charge. Because the charge did not allow Coleman's conviction on evidence of *possession* of another's SNAP card and instead just gave the offense a name different from the one used in the statute, the variance is one that must be disregarded.

Coleman's remaining complaint about the charge enlarging on the allegations in his indictment is that the charge allowed the jury to consider whether he was *stealing* SNAP benefits when the indictment did not include any allegations that claimed theft. As a practical matter, the terms in the indictment—*use, transfer,* and *redeem*—don't imply transactions that occurred without the consent of a card's authorized user. For example, the term *use* commonly implies that an object was used for a practical purpose, which for food stamps is the exchange of benefits on a card by the card's authorized user for eligible food.[47] We

---

[47]*See Use*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2523 (2002) (explaining that the term *use* "stresses the practicality of the end, result, or purpose for which something is employed"); 7 C.F.R. 2747(a) ("Eligible food. Program benefits may be used only by the household, or other persons the household selects, to purchase eligible food for the

have already discussed the common meanings of *transfer* and *redeem*, and both terms typically refer to consensual exchanges, not exchanges that occur without a party's consent.

Even though the trial court's definition of *trafficking* included the term *stealing*, we conclude the jury didn't find Coleman guilty on a theory he was *stealing* SNAP cards or SNAP benefits given the evidence before the jury in the trial. The testimony in the trial shows that Coleman bought SNAP cards from others at a discounted value for cash. Nothing in the record suggests that he took SNAP cards from others without their authorization or their consent. The State also never claimed that any of the SNAP cards Coleman used were stolen.

> For example, in opening statement the prosecutor told the jury:
>
> You will also hear evidence as to why these other individuals sold their benefits. You will hear that oftentimes that Food Stamp benefits are sold for 50 cents on the dollar. So if you get $500 of Food Stamp cards, Mr. Coleman paid $250 for them. That person would take that money and use it for whatever purposes, we don't know, and then he [referring to Coleman] would go basically fund food in his restaurant for 50 cents on the dollar and increase his profit margins.

---

household, which includes, for certain households, the purchase of prepared meals[.]") (Lexis Advance through the June 1, 2023 issue of the Federal Register).

The evidence before the jury in Coleman's trial ties Coleman to the SNAP cards he bought and to his account at Sam's. Four witnesses testified they sold their SNAP benefits to Coleman at a discount for cash, all of whom later pleaded guilty to SNAP card fraud. One witness testified she gave Coleman her card knowing that he intended to use it to buy food for his restaurant.

Testimony and exhibits before the jury show that Coleman was seen at Sam's during an undercover operation conducted by the Commission. The evidence gathered in the investigation includes undercover videos, which show Coleman coming out of Sam's on days he bought food there. The Commission used records its investigators obtained from Sam's to tie Coleman's purchases at Sam's, to his use of SNAP cards issued by the Commission, and then back again through Sam's records to the individuals SNAP cards to show their cards were being used by Coleman to make purchases at Sam's. In-store cameras from Sam's, which depict Sam's point-of-sale registers, show Coleman purchasing items at register numbers tied to Coleman's Sam's card. Transactions on Coleman's Sam's card were then tied to merchandise Coleman purchased with SNAP cards, which he had purchased at a

36

discount for cash. Some of the transactions at Sam's occurred on days when the Commission was watching Coleman outside Sam's, where the Commission's investigators saw Coleman load his vehicle with food, which he then delivered to his restaurant.

In closing argument, the prosecutor emphasized the State's overall theme—that Coleman had knowingly redeemed the SNAP cards benefits of others at a discount in return for SNAP cards, which based on the regulations applicable to the SNAP program he was not authorized to use. Still, we concede that the State mentioned stealing twice during its closing argument. In the opening section of the State's closing argument, the State's attorney argued:

> What is the importance of this statute? This statute addresses a theft of your tax dollars. Our tax dollars are paying for the food that Mr. Coleman produces on a daily basis at his restaurant. We held the people responsible that sold their food stamps to Mr. Coleman. We are collecting the restitution for the money they received. None of these individuals would have done this were it not for the fact that Mr. Coleman was willing to buy their food stamps. He - - Mr. Coleman needs to be held [to] respond for his conduct and his greed. The stealing of tax dollars affects all American, and it must be stopped. As you're your elected District Attorney, I pledge to continue to fight and protect your tax dollars.

In the final part of closing argument, the State's attorney argued the term *not authorized by law* "appears in the charge and in the

37

indictment. And that not authorized by law refers back to Federal law."

Then the State's attorney argued that under federal law, *trafficking* means the "buying selling, stealing or [ ] exchanging those food stamp benefits."[48] In the next sentence, the State's attorney concluded: "So, no buying or selling or giving away your food stamp cards in any manner not authorized as determined by the Federal government and as adopted by the Federal government."

Thus, while it's true that the prosecutors briefly argued that Coleman was *stealing* the taxpayers' money, the indictment didn't allege he was stealing SNAP cards or SNAP benefits. Except for the brief argument that we have mentioned, to which Coleman didn't object—and an argument that didn't concern Coleman's use, transfer, or redemption of SNAP cards and SNAP benefits as alleged by Coleman's indictment— the State's theme in the trial focused on Coleman's unauthorized *redemption* of SNAP benefits for cash, the *transfer* by others of their

---

[48]Of course, we recognize it's not the simple exchange of food stamp benefits that violates the law, it's exchanging them in a manner that violates the law. Although the prosecutor left off the phrase "manner that violates the law" in this sentence of his argument, the trial court didn't leave off the restrictive clause—not authorized by law—which restricts the scope of the statute to a use, transfer, or redemption that violates the regulations applicable to the SNAP program in its charge.

SNAP cards to him in return, and his *use* of the SNAP cards he purchased

to buy food. So the harm Coleman argues he suffered from the error the

trial court committed by including the word *stealing* in the charge is

theoretical, given the evidence and focus of the trial on Coleman's use,

transfer, and redemption of the SNAP cards in a manner that violated

federal law.

In conclusion, Coleman was indicted for conduct authorizing his

conviction under alternate methods for committing one offense, SNAP

card fraud. Therefore, the jury's verdict finding him guilty must stand "if

the evidence is sufficient to support a finding under any of the theories

summitted."[49] Despite the fact the trial court erred by including *stealing*

as a form of trafficking in the charge, we cannot fairly conclude Coleman

was actually harmed by that error given the lack of evidence showing he

---

[49]*See Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) (cleaned up) (explaining that when a jury finds a defendant guilty "on an indictment charging alternate methods of committing the same offense, the verdict stands if the evidence is sufficient to support a finding under any of the theories submitted"); *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (explaining that when the evidence is sufficient to support a conviction under at least one theory of the offense, the harmfulness of error in the charge is measured against the likelihood the jury's verdict is based on a theory not affected by the erroneous parts of the charge).

was stealing SNAP benefits or cards and the overwhelming evidence showing that Coleman was guilty of redeeming, transferring, and using the SNAP cards and benefits of others in a manner not authorized by federal law.[50] We overrule Coleman's second issue.

*Accomplice-Witness Instruction*

In Coleman's third issue, he argues that since the State called five co-conspirators to testify against him in the trial, the trial court should have included an accomplice-witness instruction in the charge. On appeal, Coleman acknowledges that because he didn't object to the trial court's failure to include the instruction in the charge, he must show he suffered egregious harm from the instruction's omission.[51]

A Texas statute requires that a defendant's conviction be "corroborated by other evidence tending to connect the defendant with the offense committed" when it is based on testimony from an accomplice witness.[52] Coleman argues the five witnesses who testified that they

---

[50]*Sanchez*, 376 S.W.3d at 775.

[51]*See Zamora v. State*, 411 S.W.3d 504, 513-14 (Tex. Crim. App. 2013) (explaining that if an accomplice-witness instruction is required, the failure to include it in the charge is analyzed for egregious harm if the trial court's error wasn't properly preserved).

[52]Tex. Code Crim. Proc. Ann. art. 38.14; *see Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007).

either sold him or gave him their SNAP cards were accomplices to the SNAP card fraud with which he was charged as a matter of law.

The State proved that five of the witnesses that it called to testify took part in Coleman's scheme, and that as a result, each had been convicted for their part in the scheme.[53] The law in Texas under the facts at issue is clear: "When there exists no doubt as to the character of a witness as an accomplice as a matter of law the court is under a duty to so instruct the jury."[54] The State's theory was that the five witnesses who sold or gave their SNAP cards to Coleman were involved in Coleman's scheme. We hold the trial court erred in failing to include an accomplice-witness instruction in the charge.

In general, an accomplice-witness instruction informs the jury that (1) a conviction cannot be had upon the uncorroborated testimony of an accomplice, (2) evidence is sufficient to corroborate the testimony of an accomplice if it tends to connect the defendant with the commission of the offense, but (3) is insufficient to corroborate the testimony of an

---

[53]Tex. Penal Code Ann. § 33.011.
[54]*Burns v. State*, 703 S.W.2d 649, 651 (Tex. Crim. App. 1985).

accomplice if it merely shows the offense was committed.[55] Yet when the egregious harm standard applies in the appeal, the trial court's error in omitting the instruction may be rendered harmless if the record before the jury includes evidence from sources that aren't accomplice witnesses when that other evidence fulfills the purpose an accomplice-witness instruction would have served.[56]

Under the egregious harm standard, the omission of an accomplice-witness instruction is generally harmless unless the non-accomplice evidence that corroborates the accomplice witness's testimony is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive."[57] In Coleman's case, there was an overwhelming amount of non-accomplice witness evidence before the jury, evidence that included (1) point-of-sale receipts, (2) surveillance videos, (3) evidence resulting from a search of Coleman's restaurant, (4) records of SNAP card use by SNAP card numbers and dates tied to

---

[55]*See* Tex. Code Crim. Proc. Ann art. 38.14; *see also* Comm. on Pattern Jury Charges, State Bar of Tex., Texas Criminal Pattern Jury Charges: Instruction—Accomplice Witness Testimony—Accomplice as a Matter of Law PJC § 3.3 (2018).

[56]*Herron v. State*, 86 S.W.3d 621, 632-33 (Tex. Crim. App. 2002).

[57]*Id.*

Coleman's Sam's account, and (5) testimony from investigators employed by the Commission.

The non-accomplice evidence tied Coleman directly to the unauthorized redemption, transfer, and use of SNAP benefits in a manner not authorized by law. On this record, nothing supports doubting the reliability of the documentary evidence tying Coleman to using the SNAP cards of others to buy items at Sam's. Coleman's third issue is overruled.

## Conclusion

We hold the indictment and the discovery available to Coleman provided Coleman with adequate notice by other means of the State's theory that he was knowingly redeeming, transferring, and using SNAP benefits in a manner that violated the law applicable to the SNAP program. We also hold that Coleman wasn't egregiously harmed by the alleged error in the charge. Last, we conclude Coleman wasn't egregiously harmed by the trial court's error in failing to include an accomplice-witness instruction in the charge.

Accordingly, the trial court's judgment is

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on October 14, 2022
Opinion Delivered July 12, 2023
Publish

Before Golemon, C.J., Horton and Johnson, JJ.